# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-51042

United States Court of Appeals
Fifth Circuit

**FILED**
April 24, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JAMES KENNETH GANZER, JR.,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.

ENGELHARDT, Circuit Judge:

This case is one of many filed around the country concerning the implications of a warrant issued in the Eastern District of Virginia ("EDVA"), which authorized the Federal Bureau of Investigation ("FBI") to use certain malware to identify and prosecute users of a child-pornography website known as "Playpen" that operated on an anonymity network. Defendant-Appellant, James Kenneth Ganzer, Jr. ("Ganzer"), like dozens of others similarly-situated, moved the district court to suppress the evidence obtained against him as a result of the warrant, which led to his prosecution for possession of child pornography. He now appeals the district court's denial of his motion.

No. 17-51042

To date, eight of our sister circuits have addressed issues identical to those before us. *See generally*, *United States v. Moorehead*, 912 F.3d 963 (6th Cir. 2019); *United States v. Kienast*, 907 F.3d 522 (7th Cir. 2018), *petition for cert. filed* (U.S. Mar. 22, 2019) (No. 18-1248); *United States v. Henderson*, 906 F.3d 1109 (9th Cir. 2018), *petition for cert. filed* (U.S. Apr. 1, 2019) (No. 18-8694); *United States v. Werdene*, 883 F.3d 204 (3rd Cir. 2018), *cert. denied*, 139 S.Ct. 260 (Oct. 1, 2018); *United States v. McLamb*, 880 F.3d 685 (4th Cir. 2018), *cert. denied*, 139 S.Ct. 156 (Oct. 1, 2018); *United States v. Levin*, 874 F.3d 316 (1st Cir. 2017); *United States v. Horton*, 863 F.3d 1041 (8th Cir. 2017), *cert. denied*, 138 S.Ct. 1440 (Apr. 2, 2018); and *United States v. Workman*, 863 F.3d 1313 (10th Cir. 2017), *cert. denied*, 138 S.Ct. 1546 (Apr. 16, 2018).

For the reasons set forth herein, we now join each of those circuits in holding that the good-faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984), applies to save the fruits of the warrant at issue from suppression. Accordingly, we AFFIRM the district court's denial of Ganzer's motion to suppress.

I.

In December of 2014, the FBI learned from a foreign law enforcement agency that a United States-based Internet Protocol ("IP") address was associated with the child-pornography website Playpen. A search warrant obtained in January of 2015 allowed FBI agents to seize a copy of the server that was assigned the suspect IP address;[1] determine that the IP address in fact contained a copy of Playpen; and place a copy of the server on a computer server at a government facility in the EDVA. Subsequently, the FBI was able to apprehend the administrator of Playpen at his home in Naples, Florida and

---

[1] The computer server hosting Playpen was seized from a web-hosting facility in Lenoir, North Carolina.

assume control of the website. For investigative purposes, the FBI continued to operate the website from the government-controlled server in the EDVA for a limited period of time.

Playpen operated on an anonymity network known as "The Onion Router" or "Tor."[2]  Tor software, which is publicly accessible, protects the privacy of network users by "bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address." This feature made it impossible for federal agents to determine the identities of the administrators and users of Playpen without employing additional investigative techniques.

Accordingly, the FBI requested and obtained a warrant from a magistrate judge in the EDVA ("the EDVA magistrate"), which allowed it to deploy a Network Investigative Technique ("NIT") from the government-controlled server in the EDVA. (Such warrant will hereinafter be referred to as the "NIT warrant.") The NIT was a form of malware that augmented the content sent by Playpen to the computers of Playpen users with directions instructing those computers to send identifying information to a computer controlled by the government. Specifically, per the terms of the NIT warrant, the NIT collected the following information from each computer used to login into Playpen: the computer's IP address and when the NIT determined same; a unique identifier for the computer generated by the NIT; the type of operating system used by the computer and the operating system's active username; whether the NIT had already been sent to the computer; the computer's host name; and the computer's media access control.

---

[2] The network, a project of the United States Naval Research Laboratory, was originally designed and used to protect government communications but is now available to the public.

## No. 17-51042

Through its use of the NIT, the FBI was able to link a Playpen user operating under the username of "marleyboy" with an IP address that it later determined was associated with an individual named Robert Ahr ("Ahr") residing in Austin, Texas. With this and other information, the FBI obtained a warrant from a magistrate judge in the Western District of Texas allowing a search of Ahr's residence.[3] Both Ahr and Ganzer were present at the time federal agents executed the warrant. Ahr denied any involvement with child pornography. Ganzer, on the other hand, agreed to be interviewed and admitted to using his laptop to view child pornography and access Playpen under the username "marleyboy." He subsequently confirmed these admissions in writing during an interview at the Austin Police Station. A preliminary examination of Ganzer's laptop revealed approximately 61 video files and 16,546 images containing child pornography. On December 20, 2016, an indictment was filed in the United States District Court for the Western District of Texas charging Ganzer with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).

In advance of his trial date, Ganzer filed a motion to suppress "the evidence illegally obtained during the search of his home and all fruits of this illegal search, including, but not limited to, inculpatory statements Ganzer made to police"—all of which he contended was discovered as a result of the NIT warrant. Ganzer argued that the NIT warrant, which allowed the government "to deploy malware to search [his] computer in Texas and countless computers all over the world . . . was invalid because it (1) violated the Federal Magistrate's Act, (2) violated Rule 41(b) of the Federal Rules of

---

[3] Warrants similar to the warrant issued in the Western District of Texas have issued around the country as a result of the NIT warrant, spawning a multitude of challenges in federal courts to the validity of the NIT warrant. *See United States v. Taylor*, 250 F. Supp. 3d 1215, 1222–23 (N.D. Ala. 2017) (compiling cases).

## No. 17-51042

Criminal Procedure, and (3) lacked particularity." Ganzer also argued that even if the NIT warrant was valid, its scope was limited to computers in the EDVA and, therefore, did not extend to his computer in Texas. Additionally, he urged that the good-faith exception to the exclusionary rule recognized by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984), is inapplicable with respect to the NIT warrant, since the warrant was issued without jurisdiction, and its constitutional defects were so obvious that a reasonable law enforcement officer could not rely upon it.

The district court denied Ganzer's motion to suppress. The court agreed with Ganzer that the issuance of the NIT warrant violated § 636(a) of the Federal Magistrates Act ("§ 636(a)"),[4] 28 U.S.C. § 636, and Rule 41(b) of the Federal Rules of Criminal Procedure ("Rule 41(b)"),[5] finding that the warrant impermissibly authorized a search of Ganzer's computer outside of the EDVA

---

[4] Section 636(a), a jurisdictional statute, provides in pertinent part:
Each United States magistrate judge serving under this chapter shall have within the district in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, and elsewhere as authorized by law—(1) all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts.
28 U.S.C. § 636(a)(1).

[5] Rule 41(b), titled "Authority to Issue a Warrant," generally provides that a magistrate judge "has authority to issue a warrant to search for and seize a person or property located within [his or her] district." FED. R. CRIM. P. 41(b)(1). The rule also allows a magistrate judge to issue a warrant pertaining to a person or property outside of his or her district under certain specified circumstances. FED. R. CRIM. P. 41(b). Two of those circumstances—those referenced in Rule 41(b)(2) and (b)(4)—were potentially relevant to the NIT warrant at the time of its issuance. Rule 41(b)(2) provides that "a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed." FED. R. CRIM. P. 41(b)(2). Rule 41(b)(4) provides that "a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both." FED. R. CRIM. P. 41(b)(4).

No. 17-51042

magistrate's district.[6] Nevertheless, the court concluded that suppression was not warranted since the *Leon* good-faith exception to the exclusionary rule applied. After his motion to suppress was denied, Ganzer pleaded guilty to the charge against him, specifically reserving in his plea agreement the right to appeal the motion's denial, and was sentenced to 60 months of imprisonment, followed by ten years of supervised release. This appeal followed.

## II.

"When examining a district court's ruling on a motion to suppress, we review questions of law de novo and factual findings for clear error," viewing the evidence "in the light most favorable to the prevailing party." *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (internal quotation marks and citations omitted). We will "uphold a district court's denial of a suppression motion if there is any reasonable view of the evidence to support it." *United States v. Contreras*, 905 F.3d 853, 857 (5th Cir. 2018) (quoting *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)). Along these lines, "[w]e may affirm the district court's ruling on a motion to suppress based on any rationale supported by the record." *Wallace*, 885 F.3d at 809 (quoting *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)).

## III.

On appeal, Ganzer claims that the district court correctly concluded that the EDVA magistrate did not have authority to issue the NIT warrant under § 636(a) and Rule 41(b), since the warrant authorized a search of computers

---

[6] In reaching its conclusion, the district court found that the NIT warrant did not fit within Rule 41(b)(2) or (b)(4), either of which would allow it to have extraterritorial effect. Specifically, the district court found that "logging into a website, the server for which is in the appropriate district, does not rise to the level of the computer being 'located within the district' [as required by Rule 41(b)(2)]." With respect to the applicability of Rule 41(b)(4), the district court rejected the notion that the NIT was a "tracking device," finding that "[t]he NIT is not a device, but a technique" and that it "did not 'track' Ganzer's computer under the ordinary understanding of the word 'track.'"

outside of her jurisdiction. He contends that the court erred, however, in determining that the good-faith exception to suppression is applicable under the circumstances of this case. First, Ganzer asserts that because the EDVA magistrate did not have jurisdiction to issue the NIT warrant, the warrant was void *ab initio*, making the searches conducted pursuant to it akin to warrantless searches. He states that the Supreme Court has never extended the good-faith exception to apply in the context of a warrant so-categorized. Ganzer recognizes that all other circuit courts to address challenges to the NIT warrant have found the good-faith exception to be applicable but maintains that those courts reached the incorrect result and urges this court to decline to extend the exception to cases involving warrants that are void *ab initio*.[7]

Ganzer next argues that, in any event, the good-faith exception should not apply here because the government "acted recklessly or with gross negligence" in seeking the NIT warrant, since it knew that Rule 41(b) did not allow for its issuance. As discussed in more detail below, Ganzer supports this assertion by pointing to pre-NIT-warrant efforts of the Department of Justice ("DOJ") to have Rule 41(b) amended to permit magistrates to issue warrants authorizing the use of remote-access investigative techniques. Ganzer consequently concludes that suppressing the evidence at issue in this case will serve the goal of deterrence by discouraging the government from asking magistrate judges to issue warrants that it knows they do not have jurisdiction to issue.

---

[7] The appellate court cases that had addressed the propriety of the NIT warrant and suppression of its fruits at the time the parties' briefs were filed are: *Werdene,* 883 F.3d 204; *McLamb*, 880 F.3d 685; *Levin,* 874 F.3d 316; *Horton,* 863 F.3d 1041; and *Workman*, 863 F.3d 1313. Three additional circuits took up these issues following the briefing in this case, and, for the most part, resolved the issues like the circuits that had previously addressed them. *See Moorehead*, 912 F.3d 963; *Kienast*, 907 F.3d 522; *Henderson*, 906 F.3d 1109.

No. 17-51042

For its part, the government makes little effort to defend the validity of the warrant. Instead, it focuses on the applicability of the good-faith exception and urges us to follow the lead of the other circuits courts that have addressed the issue.

IV.

A.

Because the primary focus of the parties' briefing is on the good-faith exception to the exclusionary rule and because we conclude that the exception is applicable here, we decline to address the merits of whether the EDVA magistrate had legal authority to issue the NIT warrant and assume, without deciding, that she lacked such authority. We further assume that a Fourth Amendment violation occurred as a result of the warrant's issuance. Thus, we proceed directly to our discussion of the good-faith exception and the propriety of its application in the context of this case.

The exclusionary rule was created by the Supreme Court to "supplement the bare text" of the Fourth Amendment, which "protects the right to be free from 'unreasonable searches and seizures,' but . . . is silent about how this right is to be enforced." *Davis v. United States*, 564 U.S. 229, 231 (2011). It operates by generally "bar[ring] the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Id.* The purpose of the rule is to deter violations of the Fourth Amendment—not to redress the injury of the victim of an unreasonable search or seizure. *Id.* at 236–37. Thus, application of the rule is "not a personal constitutional right." *Id.* at 236 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Nor is it automatic in the face of a Fourth Amendment violation. *Herring v. United States*, 555 U.S. 135, 140 (2009) (citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).

Expounding upon on these principles and following an evolving line of cases in which it had developed a cost-benefit balancing approach to

8

application of the exclusionary rule, the Supreme Court officially recognized a "good-faith" exception to the rule in *United States v. Leon.* 468 U.S. at 907–913. The *Leon* Court narrowly defined the exception as allowing admission at trial of "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate" but later invalidated. *Id.* at 900. The Court, however, invoked broader Fourth Amendment and exclusionary-rule principles in arriving at its holding. In particular, and relevant to the case before us, the Court emphasized that "the exclusionary rule is designed to deter police misconduct"—not judicial errors or misconduct.[8] *Id.* at 916. On the flip side, the Court noted, "it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 919. Indeed, where "the officer is acting as a reasonable officer would and should act in similar circumstances," "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way." *Id.* at 920 (internal quotation marks and citation excluded).

In conducting its analysis, the *Leon* Court further pointed to the "substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights"—namely, "guilty defendants go[ing] free or receiv[ing] reduced sentences as a result of favorable plea bargains." *Id.* at 907. "Particularly when law enforcement officers have acted in objective good

---

[8] Specifically, the Court explained:

> Many of the factors that indicate that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them.

*Leon*, 468 U.S. at 916-17.

faith or their transgressions have been minor," the Court noted, "the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system." *Id.* at 907–08. Ultimately, the Court concluded that its "evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate" compelled "the conclusion that such evidence should be admissible in the prosecution's case in chief." *Id.* at 913. The Court clarified, however, that suppression remains an appropriate remedy where "it is clear that . . . the officer [had] no reasonable grounds for believing that the warrant was properly issued."[9] *Id.* at 922–23.

Since its inception, the Supreme Court has expanded the reach of the good-faith exception to other contexts. *See, e.g.*, *Davis*, 564 U.S. at 232, 238–40 (discussing a line of Supreme Court cases applying the good-faith exception and extending application of the exception to searches conducted "in objectively reasonable reliance on binding appellate precedent" that is later overruled); *Herring*, 555 U.S. at 137–38, 144, 147–48 (applying the good-faith exception where police reasonably relied upon a computer database record that, due to the negligence of a police employee, showed a recalled warrant to still be in effect); *Arizona v. Evans*, 514 U.S. 1, 3–4, 15–16 (1995) (applying the good-faith exception where an officer who conducted a search incident to an arrest had reasonably relied on an electronic police record that, due to a clerical error, indicated that a quashed arrest warrant remained outstanding); *Illinois v. Krull*, 480 U.S. 340, 342, 349–50 (1987) (extending application of the good-faith exception to searches conducted in reasonable reliance on subsequently

---

[9] As discussed *supra*, the Court laid out four specific scenarios in which it would be clear that the law enforcement official involved had "no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23.

invalidated statutes). In *Davis*, the Supreme Court summarized the core of its post-*Leon* exclusionary-rule holdings as follows:

> [T]he deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Davis*, 564 U.S. at 238 (internal quotation marks and citations omitted).

## B.

As previously indicated, Ganzer's primary argument on appeal is that the good-faith exception categorically cannot apply under circumstances where a warrant is void *ab initio*—a description he gives to the NIT warrant. Ganzer does not cite any authority in support of his proposition. Instead, he relies on the fact that the Supreme Court has not specifically considered and applied the good-faith exception in the context of a warrant that is void from its inception. He further insists, without explanation, that warrants that are void *ab initio* have a defect that is "fundamental" and, therefore, require unique treatment in a good-faith exception analysis. Having assumed that the EDVA magistrate lacked statutory authority to issue the NIT warrant, we will also assume, for argument's sake, that the warrant was void *ab initio* and, therefore, never had any legal effect. Even with these assumptions, Ganzer's argument fails.

As the Supreme Court has recognized, whether a Fourth Amendment violation exists and what type of violation is present are separate and distinct questions from the question of whether the sanction of exclusion is appropriate in a certain case. *See Leon*, 468 U.S. at 906 ("The wrong condemned by the

11

[Fourth] Amendment is 'fully accomplished' by the unlawful search or seizure itself, . . . and the exclusionary rule is neither intended nor able to 'cure the invasion of the defendant's rights which he has already suffered.'" (quoting *Stone*, 428 U.S. at 540)). The fundamental flaw in Ganzer's argument is that it improperly focuses the exclusion inquiry on the character of the underlying Fourth Amendment violation, as opposed to whether exclusion would sufficiently further the purpose of the Fourth Amendment. *See Herring*, 555 U.S. at 141 ("[T]he exclusionary rule . . . applies only where it results in appreciable deterrence." (internal quotation marks and citation omitted)). The latter question is answered by looking at "the culpability of the law enforcement conduct." *Herring*, 555 U.S. at 143.

With the focus properly on the behavior of the law enforcement officials involved, there is no reason to distinguish warrants that are void *ab initio* from warrants that are later invalidated or recalled, or even from later-invalidated precedent or statutes—each of which, the Supreme Court has held, can be reasonably relied upon by officers in conducting a search. *See Leon*, 468 U.S. at 900; *Herring*, 555 U.S. at 137–38, 144, 147–48; *Davis*, 564 U.S. at 232, 238-40; *Krull*, 480 U.S. at 342, 349–50. In other words, the conduct of an officer who reasonably and in good faith relies on a warrant issued by a magistrate lacking jurisdiction to issue it is no more culpable than that of an officer who reasonably and in good faith relies, for instance, on a faulty indication in a database that a recalled warrant remains outstanding. *See Herring*, 555 U.S. at 137–38, 144, 147–48. *See also Werdene*, 883 F.3d at 216 ("[T]he issuing magistrate's lack of authority has no impact on police misconduct, if the officers mistakenly, but inadvertently, presented the warrant to an innocent magistrate." (citation omitted)); *Henderson*, 906 F.3d at 1118 (holding that "[a]pplication of the good faith exception does not depend on the existence of a warrant, but on the executing officer's *objectively reasonable belief* that there

was a valid warrant"). Therefore, we reject Ganzer's argument that the good-faith exception to the exclusionary rule categorically cannot apply to warrants that are void *ab initio*.[10] This holding is in accordance with the well-reasoned decisions of each of our sister circuits to have considered this issue in the context of the NIT warrant. *See Moorehead*, 912 F.3d at 968–69; *Kienast*, 907 F.3d at 527–28; *Henderson*, 906 F.3d at 1118–19; *Werdene*, 883 F.3d at 216–17; *McLamb*, 880 F.3d at 691; *Horton*, 863 F.3d at 1050–51; *Workman*, 863 F.3d at 1317–19.

## C.

Having concluded that the good-faith exception can apply in circumstances involving a warrant that is void *ab initio*, we turn to the question of whether the exception can properly be applied under the facts of this case, again presuming that the EDVA magistrate lacked statutory authority to issue the NIT warrant. As previously noted, Ganzer asserts that the exception does not apply because of the government's lack of good faith. Specifically, he argues that the government acted either "recklessly or with gross negligence in seeking the [NIT] warrant," since it knew the warrant it sought was "beyond the scope of Rule 41(b)." He contends that such knowledge is demonstrated by efforts of the DOJ well before the NIT warrant was issued to have Rule 41(b) amended to specifically allow for warrants like the NIT

---

[10] We add that although this court has not specifically addressed the issue of applicability of the good-faith exception to warrants that are void *ab initio*, it has recognized that the exception can apply in the case of a warrantless search. *See United States v. De Leon-Reyna*, 898 F.2d 486, 491 (5th Cir. 1990) (citing *United States v. Williams*, 622 F.2d 830, 840 n.1 (5th Cir. 1980) (en banc)); *United States v. Comstock*, 805 F.2d 1194, 1210 n.18 (5th Cir. 1986) (recognizing that reliance on a magistrate is not a requirement for applicability of the good-faith exception). If the good-faith exception can save the fruits of an illegal search from suppression where no warrant was issued, then, logically, the classification of a warrant as "void *ab initio*" should have no bearing on the applicability of the exception in this circuit. For this reason too, we find Ganzer's argument to be without merit.

warrant.[11] Ganzer claims that these efforts resulted from the refusal of a magistrate judge in the Southern District of Texas to issue a similar warrant in the context of a fraud investigation. *See In re Warrant to Search a Target Computer at Premises Unknown*, 958 F. Supp. 2d 753 (S.D. Tex. 2013). According to Ganzer, "the fact that the DOJ took specific and concrete action in response to that decision demonstrates an official recognition on the part of the federal law enforcement apparatus as a whole that the decision set forth the correct interpretation of Rule 41's limits in this setting;" and, therefore, federal agents could not have acted in good faith in requesting the NIT warrant. We disagree with Ganzer's assessment.

Preliminarily, we note that in *Leon*, the Supreme Court identified four situations that would indicate the presence of bad faith and call for application of the exclusionary rule, despite a warrant having been issued: 1) "the magistrate or judge in issuing [the] warrant was misled by information in an

---

[11] In support of his contention, Ganzer points to a letter dated September 23, 2013 from the DOJ to the chair of the Advisory Committee on the Criminal Rules requesting an amendment that would "authorize[] a court in a district where activities related to a crime have occurred to issue a warrant—to be executed via remote access—for electronic storage media and electronically stored information located within or outside that district." Mythili Raman, Letter to the Honorable Reena Raggi, in Advisory Committee on Criminal Rules, Materials for April 7-8, 2014 Meeting at 171 (2013); *available at* http://www.uscourts.gov/sites/default/files/fr_import/CR2014-04.pdf. According to the letter, "[t]he proposed amendment would better enable law enforcement to investigate and prosecute botnets and crimes involving Internet anonymizing technologies." *See* Raman letter at 171. Ganzer further points out that at an April 7-8, 2014 meeting of the Advisory Committee on Criminal Rules, a DOJ representative acknowledged that Rule 41(b) "on its face does not work with" crimes involving anonymizing networks, like Tor, and suggested that, absent the requested amendment, the government would be left to litigate the issue and "hope the courts [would] create an exception to the rule." Advisory Committee on Criminal Rules, Minutes at 13 (Apr. 7-8, 2014); *available at* http://www.uscourts.gov/sites/default/files/fr_import/criminal-min-04-2014.pdf. The government does not dispute that these interactions occurred or the DOJ's efforts to have Rule 41(b) amended. Notably, Rule 41(b) was eventually amended to specifically allow for warrants like the NIT warrant. However, this amendment did not take effect until December 1, 2016—almost two years after the NIT warrant's issuance.

affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; 2) "the issuing magistrate wholly abandoned his judicial role"; 3) the "affidavit [in support of the warrant is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and 4) the "warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."  468 U.S. at 923 (internal quotation marks and citations omitted).  The challenge posed by Ganzer does not correspond to any of these scenarios, and we do not find it to be otherwise compelling.

To be sure, whether the NIT warrant's issuance was legitimate under § 626(a) and Rule 41(b) was questionable at the time it was issued.  The government does not dispute this.  This is because the NIT warrant "pose[d] difficult conceptual questions" regarding the search that it authorized. *Kienast*, 907 F.3d at 528.  The NIT was a "sophisticated tool" developed by the FBI in a world of rapidly changing cyber technology in response to the "daunting task of [unmasking, locating, and] apprehending tens of thousands of individuals engaged in perverse crimes but cloaked in anonymity through their use of Tor." *Id.* at 529.  Whether this new technology fit within the bounds of Rule 41(b) when it was developed was not readily apparent, particularly given that there was no federal appellate court precedent regarding the permissibility of remote-access investigative techniques at the time. *McLamb*, 880 F.3d at 689, 691.  That being said, it was neither plain nor obvious that NIT warrant *could not* properly be issued under Rule 41(b).  This is confirmed by the fact that several federal district courts have concluded that the EDVA magistrate had authority to issue the warrant under Rule 41(b)(4) concerning "tracking device[s]." *See United States v. Austin*, 230 F. Supp. 3d 828, 832–34

(M.D. Ten. 2017) (collecting cases and concluding that the NIT constitutes a "tracking device" within the meaning of Rule 41(b)(4)).

Under these circumstances, we do not construe the government's efforts to have Rule 41(b) amended to specifically allow for warrants like the NIT warrant as an admission that such warrants were not previously allowed, but rather as an attempt to clarify an existing law's application to new circumstances. The government did not act unreasonably in seeking such a clarification. We note that this conclusion is consistent with the Fourth Circuit's holding in *McLamb* with respect to a similar argument by the appellant. In *McLamb*, the appellant argued that the FBI's consultation with DOJ attorneys prior to seeking the NIT warrant regarding such a warrant's legality demonstrated a "guilty conscience" on the part of the FBI. *See McLamb*, 880 F.3d at 691. The court rejected this argument, instructing that where there is not "definitive precedent upon which law enforcement can rely when utilizing cutting edge investigative techniques . . . consultation with government attorneys is precisely what *Leon's* 'good faith' expects of law enforcement." *Id.* *See also Moorehead*, 912 F.3d at 970 (rejecting the appellant's argument that government attempts to have Rule 41(b) amended demonstrated knowledge of the NIT warrant's illegality). Likewise, we conclude that the government acted in accordance with the expectations of the Fourth Amendment by seeking to clarify the bounds of an imprecise statutory grant of authority in the face of advancing technology.

Moreover, we do not otherwise detect foul play in the process by which the FBI sought the NIT warrant. As the First Circuit aptly recognized in *Levin*:

> Faced with the novel question of whether an NIT warrant can issue—for which there was no precedent on point—the government turned to the courts for guidance. The government presented the magistrate judge with a request for a warrant, containing a

detailed affidavit from an experienced officer, describing in detail
its investigation, including how the NIT works, which places were
to be searched, and which information was to be seized.

874 F.3d at 323. Like the *Levin* court, "[w]e see no benefit in deterring such
conduct" and agree that, "if anything, such conduct should be encouraged,
because it leaves it to the courts to resolve novel legal issues." *Id.* *See also*
*Workman*, 863 F.3d at 1320–21 (concluding that it was reasonable for the
federal agents who applied for and executed the NIT warrant to "defer to the
magistrate judge on . . . nuanced legal issues"). To the extent that the EDVA
magistrate erred in issuing the NIT warrant, as we have noted, such an error
is not within the purview of the exclusionary rule. *See Leon*, 468 U.S. at 916.

In light of the foregoing, we reject Ganzer's assertion that the good-faith
exception cannot apply under the facts of this case due to bad faith, gross
negligence or reckless conduct by the government officials involved. To the
contrary, we conclude that the law enforcement officials involved in the
issuance and execution of the NIT warrant acted "with an objectively
reasonable good-faith belief that their conduct [was] lawful." *Davis*, 564 U.S.
at 238 (internal quotation marks and citations omitted). Again, our conclusion
is consistent with the holdings of each of our sister circuits to have considered
challenges to the NIT warrant. *See Moorehead*, 912 F.3d at 970–71; *Kienast*,
907 F.3d at 528–29; *Henderson*, 906 F.3d at 1119; *Werdene*, 883 F.3d at 217–
18; *McLamb*, 880 F.3d at 690–91; *Levin*, 874 F.3d at 322–4; *Horton*, 863 F.3d
at 1051–52; *Workman*, 863 F.3d at 1319–21.

V.

Considering the reasonable behavior on the part of the federal agents
involved in seeking and executing the NIT warrant, we do not ascertain any
deterrence benefit to be derived from applying the exclusionary rule here,
much less one that would outweigh the substantial cost that would result from

applying the rule, *i.e.*, the inability to effectively prosecute potentially thousands of Playpen users. *Herring*, 555 U.S. at 141 ("To the extent that application of the exclusionary rule could provide some incremental deterrent [to Fourth Amendment violations], that possible benefit must be weighed against its substantial social costs." (quoting *Krull*, 480 U.S. at 352–53)).

Accordingly, we hold that the good-faith exception to the exclusionary rule is applicable to the NIT warrant and its fruits and, therefore, AFFIRM the district court's denial of Ganzer's motion to suppress.